Your Honor, it's a pleasure to be here today, and I'm representing Mr. Buck and James Tree. He has a claim for Social Security Disability Benefits. He applied in 2006 for that claim. For the prior 30 years prior to his applications, he had earnings in every year for 30 years, although he did battle depression throughout his life. He fought through that depression and continued to work until 2005 when he was diagnosed with a full-blown bipolar disorder under Listing 12.04 of the Social Security regulations. Mr. Buck had worked for the previous time prior to his hearing mostly as an apartment maintenance manager or, excuse me, worker, not manager. He worked in that field for over 13 years, earning over $225,000. Not a lot of money for 13 years, but he had some difficulties, and he worked through them, and he fought hard and never applied for Social Security Disability Benefits. He lost that job, and then he got another job that lasted somewhere between two to three months. The commissioner states three months, and we state two to three months because the work history report shows that job ended on October 31, 2005, and it began sometime in August of 2005, but we don't know the exact date. If it was at the end of August, it would have been two months. If it was at the beginning of August, it would have been a three-month job. The importance of this is because the ALJ found a singular job that Mr. Buck could do. That was a job of warehouse worker that he earned a total of $2,600 for, worked somewhere between two to three months. He said that he could not do his job as the apartment maintenance worker. If we look at just the findings of the administrative law judge and we give them full weight, it is our position that the reversible error was committed and this case should be remanded. The reason we cite to that is because the administrative law judge found in his specific finding of RFC that Mr. Buck had a personality disorder and a bipolar affective disorder, 12.04. As a result of that, he was limited in working with coworkers and he was limited in working with the general public. He had a vocational expert at the hearing the judge had called, and he asked the vocational expert if the person is limited in working with the general public and if the person is limited in working with coworkers, could they do the past work of the claimant? Then he added in a few other physical limitations of safety at heights, not working at unprotected heights and such. The vocational expert said, no, he couldn't do the apartment manager worker, but he could do the warehouse worker. Now, what's important about that is in the record in the first volume at page A51 is the ALJ's decision. The ALJ discusses and says, yes, I asked the vocational expert about coworkers and about working with the public. I did not ask the vocational expert about any limitations dealing with supervisors. In that same paragraph, the judge says, Dr. Gentile, who was a clinical psychologist and works for the state agency that makes the decisions on the initial determination claims, had found that he did have limitations working with supervisors and specifically said that he needed to have clear and directive supervision in order to avoid power struggles, sounding like sheltered work. Of course, sheltered work would result in a finding of disability. The judge in his decision specifically says, I find that that decision, that opinion from Dr. Gentile is supported by the evidence. The judge did not incorporate it into his official RFC finding, nor did the judge present that to the vocational expert in his hypothetical, nor did the judge follow Social Security ruling 8262 in your court's Pinto case that requires a persuasive analysis in order to determine if you have a Step 4, if Step 4 finding of a job can be met. Because of that, even if we accept the judge's findings, even if we accept the fact that his only limitations were working with coworkers, with the general public, and his adoption of Dr. Gentile's, that he had limitations working with supervisors, then his analysis, if you go back to that past work, does not muster scrutiny under Social Security ruling 8262. That particular ruling requires that findings cannot be cursory. The issue must be fully developed and explained. The ALJ's rationale must not be based on presumptions, speculations, or suppositions. At A51, in the next to last paragraph, I think is critical and determinative of this case, because the ALJ states in that paragraph that he accepts Dr. Gentile's limitations regarding clear and directive supervision to avoid power struggles. He says that he did not present that to the vocational expert. He says, but nevertheless, I feel that he can do his past work with that limitation. See discussion below, in parentheses. If you search the judge's decision below, there's no discussion, none, about, and you'd think there would be, because the ruling, Social Security ruling 8262, clearly states that it can't be based on speculations, suppositions, presumptions. It has to be fully and fairly developed. There's got to be an explanation. He had a vocational expert there. He could have just simply said, hey, if a person needed clear and directive supervision to avoid power struggles, could he do that job? And he could have relied on that. In fact, the only reference we see later was a reference that says, I did rely on the vocational expert testimony to determine that he could do this past work. But the fatal error is that he never presented that limitation for supervisor contact to the vocational expert, nor did he independently evaluate that evidence in his decision. So accepting everything the judge says, we have fatal, reversible, legal error in this case. The second Step 4 issue has to deal with an issue that the government has said has been waived, and that is whether or not the warehouse worker job even is past relevant work. If it's not past relevant work, then clearly the case needs to be remanded, because the judge made no alternative Step 5 findings of identifying any jobs in the regional or national economy that Mr. Buck could do. This was the singular job identified, the two- to three-month job. We feel that this was not waived. The commissioner in their brief stated that the federal court judge, Judge Succo, had had a de novo hearing, that he was fully briefed, and he considered all the issues. The federal judge, Judge Succo, was presented a report and recommendation from the magistrate judge. The briefings to the magistrate judge did not contain this second part of the Step 4 analysis. It did contain the first part about, that I just explained, about not following Social Security Rule 8262 and Dr. Gentile's opinions, and the judge accepting those, about limitations dealing with supervisors. But the opening brief to the federal judge, Judge Succo, did contain a complete recitation of this issue on pages 9 to 10, and the government responded completely to Judge Succo, and it's Judge Succo's decision that we are appealing. So we do not believe that that issue was waived, Your Honor. It's important because the regulation that deals with past relevant work is 20 CFR section 404.1565A. One problem I have with that is that Judge Succo did not make a de novo decision, in a sense. He just adopted the report and recommendations. So how do we know that he, absent an objection to the R&R, that he took up this new issue? We know because the defendant admitted so in their brief to this court, and in their brief they said that they considered that Judge Succo did do a de novo review and that he considered all the issues. Judge Succo, he adopted the report and recommendation, and I think he made a mistake. I think he made a mistake when he said that there's no new issues brought up, this is just a rehash of the issues before the magistrate judge. That was clearly a mistake. The government had argued waiver to Judge Succo. But they had their opportunity in court to present that below at the federal court. And I can't control, you know, Judge Succo had it. He had their argument. It was fully briefed. It's not new facts. It's not new issues. It was in the record before the administrative law judge. The regulation on past relevant work that sets out that past relevant work has to meet three criteria, dealing with duration, that it has to have been long enough to learn the job, that it has to be done in the last 15 years, has to be formed at SGA, also states, and this is an important, I think, sentence in the regulation, if you have worked for brief periods of time, we can generally consider that these do not apply. So that's what this was. It was a brief work attempt that he tried to do. The season ended, but he also testified that he had missed work, that he came in late because of impairments. This was a last-ditch effort to try to work. He was treated by Central Washington Comprehensive Mental Health, the local mental health clinic in Yakima County, for a number of years. Chris Clark, in the record, he wrote in his chart notes, he wrote in his notes that he says, I have encouraged him to apply and to follow through on a social security disability application. This is another point that we've brought out, that the administrative law judge had rejected six different mental health opinions. We believe improperly. Each of those were consistent with each other. Each of them were consistent with a personality disorder and a bipolar disorder, which the judge found that Mr. Buck had. In fact, the judge in his own decision found that Mr. Buck has mood swings, difficulty with mood, and he also has irritability. So that's consistent with their findings. All three mental health counselors that he saw at Central Washington Comprehensive Mental Health have provided functional reports. They're all consistent. They all said that he had a very significant interference in the ability to deal with normal work stressors and in dealing with supervisors. When that question was asked to the vocational expert by myself at the hearing, the vocational expert said, hey, there's no jobs he can do with those limitations. These three mental health workers, none of them are acceptable medical sources, but under Social Security ruling 06-03-P, sometimes mental health workers are to be given more weight on severity, not on diagnosis, not on medically determinable impairments, but on severity than an acceptable medical source. The ruling explains that today we live in a time of managed health care. Everyone's interested in lowering the cost of care. And because of that, acceptable medical sources no longer, in many cases, give the primary treatment. That's left to the mental health professionals, as an example specifically stated in the ruling. And in those cases, we should give more weight to those mental health professionals than we would to an acceptable medical source. We feel like the judge did not – his main reason was these opinions weren't consistent with the record. But they were the record. They were – that was a totally consistent approach. You're down to a little less than three minutes. Do you want to save some time for a bottle? Okay, thank you, Your Honor. A lot shorter than most of the – It's a nice feature of the podium, I think. Good morning. May it please the Court. I'm Nancy Michelini for the Commissioner. Counsel. This Court should affirm for at least these three reasons. First, the ALJ reasonably interpreted the medical evidence and all the evidence in the case and reasonably found that Mr. Buck could do his past relevant work. Second, uncontradicted evidence of malingering in the evidence – rather, in the record shows that Mr. Buck's claims are not credible. And third, Mr. Buck has not met his very heavy burden of proving ALJ bias. I know counsel didn't talk about the bias claim at all, although he devoted most of his reply brief to that issue. Let me interrupt you for a moment, counsel, and have you pick up on the point that counsel left off with, which is the ALJ's evaluation of the mental health professionals. Because it did seem to me, in viewing the record, that he discounted much of Mr. Buck's evidence, finding that they were inconsistent with particularly evidence or citations in the record to the fact that he at times really improved or benefited from treatment. But doesn't that insufficiently take into account the nature of the bipolar diagnosis, which the ALJ found that he had? It is cyclical in nature. So how do you respond to that? That's correct, Your Honor. However, the ALJ is looking at all of the evidence in the record. There weren't six. I don't believe there were six opinions that he rejected. But he did reject the DSHS opinions, which were Mr. Clark, Mr. Harmon, and Mr. Gangler. And he did reject those opinions because those opinions, when you look at the contemporaneous treatment notes, the treatment notes of Lisa Akers, I believe her name is, they're inconsistent with the treatment notes. Once he got started on the medication, on his bipolar medication, and once they got that adjusted, which adjusting medication is a normal part of mental impairments, he was doing well. If you read the treatment notes from Lisa Vickers, which start at 322 and go through 329, they're sort of spread out through the record. They start up again at 427 and go to 446, and then from 448 to 449, or rather 479. But it just shows that when he came in and, you know, he said he was doing great, she assessed him with gap scores of high 50s and 60s every time. I think there was more than that. Not every time. But I think the criticism, if it's valid, is that this progress that's reflected in the ALJ's opinion, and to some extent in the notes, is episodic. He's up, he's down. He's up, he's down. Classically symptomatic of bipolar disorder. And it appears, or it could be argued, that what the ALJ did in justifying his conclusion is to harvest those comments by treatment folks about his progress, leaving everything else, including failures thereafter, unmentioned. You know, yeah, at times he showed some progress. At times his scores improved. But at times he had very serious problems thereafter. Very typical of the ailment. And there doesn't seem to be any accommodation, much less analysis, or even discussion by the ALJ of that. Oh, there's an extensive discussion of the mental impairment evidence. I know. And then the ALJ says, ah-ha, but he's, you know, taking medication and he's doing much better. Well, there are reports in the record, whether the ALJ considered them or not, that, yeah, sometimes he's up and sometimes he's down. And, you know, that shouldn't surprise us. And I'm sure it didn't surprise the ALJ. But that's what bipolar is. And it doesn't really speak to the ultimate issue. Well, Mr. Buck said that he had bipolar disorder earlier in his life. And that was from 1995 to 2000, which is what he told Mr. Clark when he first came in for his first evaluation. And he said he had been treated for it then and he had taken medication, and evidently he was able to work. Mr. Tree just told us he worked for 30 years. So evidently he's been able to work with his bipolar disorder in the past. The whole genesis of this, how this all started, is that he had some sort of angina attack and he thought he was having a heart attack. So he said, gosh, I can't work anymore because I've got this heart problem. Well, the heart problems all turned out to be nothing. I mean, he does not have a serious or a significant heart problem. He has mild coronary disease. So that doesn't prevent him at all from working. And then he also said that, you know, along with this, gosh, I think my depression is coming back, because he thought, well, now I'm not going to be able to work anymore, or now, you know, I physically can't work anymore. And so they restarted him on the medication, and he does well on the medication. And obviously he's done it better. He has done better at times on the medication. But the balance, getting that right recipe of medications, is a persistent problem throughout his entire medical history. We don't find a point in time where, ha-ha, they've settled on the perfect blend. It's constantly being tinkered with, which is typical of the ailment, is it not? Well, sure. You're right, Your Honor. And the ALJ just mentions the medications. He doesn't, in any sense of the word, discuss the effects, the duration, and so forth and so on. He just lists the medications in his opinion. That doesn't comply with the regulation. Well, he cites the evidence. He points to the evidence, which are the page numbers that I just gave to the court, which are the treatment records. Those are the records where he comes in to see Lisa Vickers, who's a nurse practitioner, and her records show that he improved and his symptoms were well-controlled, by and large. I mean, true, there were times when he wasn't doing as well as other times, but by and large his symptoms were well-controlled with the medication. You know, the ALJ is in a tough spot. You know, he has to look at all this evidence. When you look at the findings, or rather the opinion, of Dr. Gentile, the state agency reviewing physician, she examined the records up until that point, up until September of 2006. So what she was actually looking at was she was looking at the records from Dr. Rodenberg, and Dr. Rodenberg was actually the first physician who saw him at the clinic, and he didn't think he really truly had a bipolar disorder, but he put him back on the medication because Mr. Buck had said that it worked for him in the past. She looked at that evidence. She also looked at the evaluation from Jody Veltkamp, Dr. Veltkamp, and the evaluation from Dr. Williams. Dr. Veltkamp performed numerous diagnostic tests and determined that, so during the evaluation he was pleasant and easy to engage in conversation. He had no difficulty following complex commands. His speech was fluent, logical, and coherent. His approach to the task was appropriate. There was no significant slowing, impulsivity, or perseveration. His attention level was excellent. I mean, she said that he could do, she recommended that he should be greatly encouraged that he's demonstrating tremendous strengths in his visual-spatial processing, and most of his talents in this area fall in the high average to superior range. So she says he should be encouraged to go to careers that highlight hands-on and visual-spatial processing. Well, he says, even in his own function report that he submitted to the agency, he says that he takes computers apart and repairs them, builds and repairs computers. That's at 200 in his function report. There's no indication in his function report when he applied that he has any problems, any mental problems. It was all physical. He just said, hey, let's get going. Well, I don't know. I mean, you've got the Harmon report, which is the state report, and you've got checks severe inability to work and respond appropriately and the pressures of expected normal work setting and so forth. Sure. I mean, it's not a rosy picture, really. Sure. And those are the DSHS records. That's the Department of Social and Health Services. It's a state agency, and he's coming to get state funding and state help, and he is. As Mr. Tree noted, he's on GAX, which is he's allowed to get Medicaid, so he gets medical benefits. But while he's on Medicaid, they approved him for that, he also has to apply for federal benefits. That's a requirement, and so they keep him on that, and if he doesn't pass muster with the federal standards, then he'll be moved from GAX to GAU. But it's sort of remarkable. I mean, most of the time you get an examining physician for the state, and they reject the treating physicians. I mean, the reports are not favorable generally from the state agency, and we heard some cases the last few days on that. So this is sort of remarkable that the state agency says, boy, this is severe. All three of them. Which state agency? Which report are you referring to? I'm talking about the Harmon report. You don't think that's?  Clark, Harmon, and Gingrich. Clark, Harmon, and Gingrich. No, it's not at all. We see these in DSHS reports all the time. All of the reports that we get in these all say that they're marked as severe. Gosh, I haven't seen that the last few days from Washington. I mean, that's just a – our sampling may be incomplete. For example, well, the ALJ pointed out that the mental status examination doesn't match with Mr. Harmon's report. I mean, he's saying severe to marked. Well, look at his status report, or rather mental status examination, which is at 411 and 412. And in each case it's the same thing. Appearance neat. Hygiene good. Posture appropriate. Facial expressions alert. Normal, normal, normal. Everything's normal. Cooperative. Okay, they check off depressed. Granted. But nothing – he's oriented in all spheres. His judgment is good. His remote and recent memory are both good. He has normal thought content, logical stream of thought. So the mental status examinations don't match the marked and severe limitations. May I switch gears for a minute because your time is running down? Would you address the hypothetical that was posed to the folk rehab expert and the argument that it did not encompass all of the limitations that he had? Well, and as the district court judge noted, that he's simply arguing that the ALJ didn't include all the limitations that he's arguing should have been included. Right, but one thing might have made a difference. That was the power struggle issue. In other words, inability to get along with supervisors. And that's the one that counsel highlighted today. And I'm curious as to your response. I wanted to make sure you had a chance to respond. Sure. Well, the ALJ gave partial credit to Dr. Gentile's opinion. But he didn't include that Mr. Buck should have the clear and direct supervision because he found that it wasn't significant in light of the entire record. And as I started to say before, Dr. Gentile had only Dr. Velkamp, Dr. Williams, and Dr. Rodenberg's reports in front of her. And we know this because you can see it at 303. You can see it says consultant's notes and it says what she was looking at. The ALJ has the entire record. He has the function report that Mr. Buck submitted when he applied. He has all the treatment records. He has everything in the record. And then he takes a look at everything to see if it balances out. Right, but he credited Dr. Gentile's report, did he not? He credited partially. Well, where did he discredit the finding about the power, struggle, and inability to get along with supervisors? It's at- That's the C discussion below that never materialized. No, the C below discussion is C below discussion of past relevant work. It's right after the words past relevant work. What he did, he said, attention and concentration would be episodically slowed by psychological symptoms. He's referring to Dr. Gentile's report. He said, however, the undersigned finds the evidence summarized above show this limitation would be mild. So he doesn't give a limitation for that. And then down here, a little bit further down, he said, although the undersigned did not provide a limitation for clear and direct supervision, the undersigned finds this limitation is not significant and would not prevent him from performing his past relevant work. And he's basing that on all of the evidence in the record. But in common parlance, where does he get off saying that? Why isn't that something that we should elicit from the relevant sources? He was crediting Dr. Gentile. His report, he largely credited, had that observation. And he simply makes his own judgment that it has little, if any, impact on the ultimate question of his disability. The ALJ looks at all of these. Without a medical expert. With a medical expert who's a cardiologist. Isn't that peculiar? Because below, they were arguing that he had physical impairments. That's why he called the medical expert. So that's why he called the medical expert. He had Dr. Veltkamp. The ALJ credited Dr. Veltkamp over Dr. Williams and over Dr. Gentile. Dr. Gentile's a reviewing physician. She reviews the records. That's all she does. She doesn't examine anybody. She doesn't see anybody. So she's reviewing the records. The ALJ gets to look at all of the records. That's what's different from what the ALJ is doing as opposed to what she's doing, really. The ALJ is not a physician. The ALJ is just reviewing the medical evidence. So tell me why you think that's a better review than a reviewing physician. Because the reviewing physician did not have all the treatment records. She did not have any of the treatment records. The ALJ has all of the treatment records right up to the point where he makes his decision, where he issues his decision, which was in 2009. Wouldn't that warrant a remand? Excuse me? Why doesn't the physician have the treatment records? And if that's the case, why doesn't this case go back to the appropriate physicians with the full record, and then we'll hear the opinion? I respect the ALJ, but he's not a doctor. But, you see, Dr. Gentile reviews the records at the point of the reconsideration. There's an initial decision that's made by DDS, and then there's a reconsideration where another DDS physician, and that was Dr. Gentile in this case, takes another look at the evidence. And that's all she had up to that point in September of 2006. But the record keeps going. I mean, as this Court must know, they submit evidence to the Appeals Council. They submit evidence at the district court level. I mean, the evidence just keeps coming in all the time. And the ALJ takes a look at all the evidence that has come in from the beginning of the case until the time. I see that I'm out of time. Finish your thought. Okay. He takes a look at all of the evidence, the entire record, and he has to balance out and weigh that evidence. And he very heavily weighed the treatment records. The treatment records showed that Mr. Buck improved. Thank you, Counselor. Our questions took you over time. Thank you for your argument. We have about two and a half minutes left for rebuttal. I'd like to just take a close look at the ALJ's at page 8 of his decision, which is A51. When he talked about Dr. Gentile's opinion, the state agency psychologist, he said, As for the opinion evidence, the mental, residual, functional capacity assessment is given significant weight. That was the opinion of Dr. Gentile. There was one thing that he didn't agree with with Dr. Gentile. He specifically said that. He says attention and concentration, Dr. Gentile said he had limitations with that, but he didn't agree that he had in the attention and concentration. But he says, and after that, he says, Dr. Gentile had said that the claimant should have clear and direct supervision to avoid power struggles. He said that opinion was affirmed on reconsideration by another state agency psychologist, Exhibit 12F. It was opined by Dr. Gentile. Then his very next sentence is, This opinion is supported by the evidence summarized above and is consistent. He then goes on to state that he didn't present it to the vocational expert, that limitation. He accepts it as a limitation. He says he's going to discuss it below, and the only thing he discusses below is that he relies on what the vocational expert told him. To an incomplete hypothetical that the judge himself made a finding that this person had limitations dealing with supervisors. The episodic nature of Mr. Buck's impairments are quite well documented in the record, and even in the commissioner's brief. What they'll say is they'll say he's doing much better today. They say that about six or seven times. If he's doing much better today, it implies yesterday he wasn't doing so good, and they're just picking out all the times, all the days he's doing better. If he was continually doing better, it wouldn't say he's doing better. As a matter of fact, his last note that's in the record is March 2009, where it said on March 2009, and that's when the ALJ's hearing was held. This is at the end of the period. Mr. Buck's sleep had improved significantly, and his mood was better. He felt less paranoid and slightly anxious. So that was a day that he had improved significantly, but that means yesterday he was significantly worse, and that's reflected in the record. It's reflected in the opinions by the state, Washington State, in their reports, and I disagree that these all contain mark. They don't. He was approved for GAX. The regulations say, and GAX uses the same standard as Social Security Disability. Dr. McRae at 402, he answered a question that says, considering SSA disability criteria, is this person should be approved for Medicaid? He said, yes, he should, under listing 12.04 bipolar, that he met that listing. Now, as we look at the state's reports, the DSHS reports, they actually get worse as time goes on. The last one is Paul Harman's. That's dated 2008. The first one is Chris Clark in 2006. Excuse me, Ron Gangler is the last one, 2008, and that's the one that said severe at 422, 7-2808. So it's actually, he had been upgraded from a mark, which by definition is a very significant interference in dealing with supervisors and dealing with work stressors, to a severe, means definition, inability to deal with supervisors and coworkers. If I could just have, do I have just. You're about a minute over, but if you can sum up. Yesterday there was a supplemental authorities filed in the case from the commissioner, and they cited Social Security Ruling 13-1P, which is a ruling that's come out about how to object when you have, you feel like there's bias with a judge. We wish this ruling had been in effect at the time of Mr. Buck. It wasn't in effect. It says that on page three of that ruling, it says that if an ALJ does not follow procedures, that is abuse of discretion and the matter will be remanded to a different ALJ for a new hearing. And that's what we feel like is the evidence in this case. It's not just that the judge said that he has to protect the public fist, but it's that coupled with the fact that he told the schedulers not to schedule a consultative exam with a treating physician when the regulation clearly says that the preferred provider for a consultative examination is the treating physician and they should normally be considered first. He gave a clear directive to them to disregard that procedure, which is allowed for in law, and so we think it's that combination. If just the fact that he protects the public fist alone is not enough, but when you combine that with his clearly not following the law and the regulation, then those two become troublesome because it means maybe he's protecting the public fist contrary to his own regulations. Thank you, counsel. Thank you. Case to serve will be submitted for decision. We will take a ten-minute recess and then we'll hear our last two cases on the calendar.
judges: Dearie, Thomas, Nguyen